**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **JOHN R. LYON III, Derivatively on Behalf of AMC Entertainment Holdings, Inc.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**ADAM M. ARON, CRAIG R. RAMSEY, CHRIS A. COX, LINCOLN ZHANG, JACK Q. GAO, LLOYD L. HILL, GARY F. LOCKE, HOWARD W. KOCH, JR., KATHLEEN M. PAWLUS, ANTHONY J. SAICH, MAOJUN ZENG, PHILIP LADER, LEE E. WITTLINGER, and ADAM J. SUSSMAN,**<br><br>**Defendants**<br><br>**-and-**<br><br>**AMC ENTERTAINMENT HOLDINGS, INC., a Delaware corporation,**<br>**Nominal Defendant** | **Case No.**<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**REDACTED PUBLIC VERSION** |

Plaintiff John R. Lyon III ("Plaintiff"), by and through his undersigned counsel, brings this stockholder derivative action in the name and on behalf of nominal defendant AMC Entertainment Holdings, Inc. ("AMC" or the "Company") against defendants Adam M. Aron, Craig R. Ramsey, Chris A. Cox, Lincoln Zhang, Jack Q. Gao, Lloyd L. Hill, Gary F. Locke, Howard W. Koch, Jr., Kathleen M. Pawlus, Anthony J. Saich, Maojun Zeng, Philip Lader, Lee E. Wittlinger, and Adam J. Sussman (collectively, the "Individual Defendants," and, together with AMC, the "Defendants") for breaches of fiduciary duty, unjust enrichment, contribution pursuant to Sections 10(b) and 21D

of the Securities Exchange Act of 1934 (the "Exchange Act"), and other violations of law.

Plaintiff bases his allegations on personal knowledge as to his own acts, and on information and belief as to all other allegations, based upon due investigation by counsel, including, but not limited to: (a) review and analysis of public filings made by AMC and other persons with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, financial statements, and other publications caused to be disseminated by certain of the Defendants and other persons; (c) review and analysis of news articles, shareholder communications, and postings on AMC's website concerning the Company's public statements; (d) review and analysis of court filings in the related consolidated securities class action lawsuit alleging violations of federal securities law based on similar facts and circumstances alleged herein, styled *Hawaii Structural Ironworkers Pension Trust Fund v. AMC Entertainment Holdings, Inc., et al.*, 1:18-cv-00299-AJN (S.D.N.Y.) (the "Securities Class Action")[1]; and (e) review and analysis of other publicly available information concerning AMC, the Individual Defendants, and other persons.

**INTRODUCTION AND OVERVIEW**

1. This stockholder derivative action seeks to remedy fraud and other wrongdoing committed by AMC's current and former directors, officers, and controlling stockholder in connection with the Company's acquisition and failed integration of Carmike Cinemas ("Carmike"), and numerous false and misleading statements and omissions related thereto which were designed to hide such information from the public.

2. AMC is the largest movie theater operator in the world, with almost 1,000 movie

[1] The Second Amended Class Action Complaint filed in the Securities Class Action on November 21, 2018 (the "Securities Action Complaint") is attached hereto as Exhibit A to Exhibit 1.

theaters primarily located throughout the United States and Europe.

3. Prior to 2016, AMC had been performing well and even announced record-setting results during 2015. The Company primarily attributed these results to the success of two strategic growth initiatives—reseating a large number of its theaters with reclining chairs, and introducing an expanded selection of food and beverage menu offerings in its theaters.

4. As part of an expansion project, in March 2016, AMC announced the acquisition of Carmike. Unlike AMC's theaters, which had been substantially upgraded over the years and were primarily located in wealthier metropolitan areas, Carmike primarily serviced smaller, more rural communities. Notably, AMC had engaged in substantial pre-transaction due diligence with respect to the Carmike acquisition, and on December 20, 2016, during a conference call, Defendant Aron, AMC's President and Chief Executive Officer ("CEO") informed investors that AMC had "plenty of time to look at … Carmike" and analyze Carmike's operations.

5. After AMC announced its intention to acquire Carmike, the Company told investors that it expected to realize $35 million in annual operating synergies from the acquisition, arising from reduced film exhibition, concession, overhead, general and administrative and other expenses, and by reseating a limited number of Carmike movie screens with reclining chairs in those markets where the undertaking was financially prudent. Specifically, AMC told investors that it intended to reseat only 15% of Carmike's movie screens over a five-year period at an expected cost of $50 million to $60 million. For the remainder, AMC intended to retain "Carmike's lower cost structure at theaters with lower visitation."

6. The Carmike acquisition was completed on December 21, 2016, for $858.2 million. As part of the Carmike acquisition, AMC assumed $230 million in debt.

7. In addition to the Carmike acquisition, in the second half of 2016 and the first half

of 2017, AMC completed a full acquisition of two European theater chains: Odeon and UCI Cinemas Holdings Limited ("Odeon") and Nordic Cinema Group Holding AB ("Nordic"). As part of the Odeon transaction, AMC paid $593.2 million of Odeon's outstanding debt.

8. These acquisitions were primarily financed with debt, causing the Company's indebtedness of $3.4 billion as of September 30, 2016 to balloon to $6.6 billion by December 31, 2016.

9. To deleverage the massive debt financing related to the Carmike acquisition and the European expansion, the Company undertook a secondary public offering ("SPO"). On December 21, 2016, AMC filed with the SEC a Form S-3 registration statement, which incorporated a prospectus and prospectus supplements that were later filed with the SEC (collectively referred to herein as the "Registration Statement"), offering to sell to the public 21,904,761 common shares in the SPO at a price of $31.50 per share. Ultimately, on February 8, 2017, pursuant to the Registration Statement, AMC offered approximately 22 million shares of AMC common stock, raising approximately $618 million.

10. As would later be revealed, however, the Registration Statement contained false and misleading statements and omissions about the Company's newly-acquired Carmike and Odeon businesses, and failed to identify and disclose known trends, events, demands, commitments and uncertainties that were then having, and were reasonably likely to continue to have, a material adverse effect on AMC'S operating performance. Regarding Carmike, the Registration Statement failed to disclose that Carmike's protracted lack of investment in its theaters caused them to be in a state of significant disrepair, and that AMC had been unable to retain or convert Carmike's loyalty program members following the acquisition. Regarding Odeon, the Registration Statement misleadingly stated that Odeon was seasonally stronger in the

summer months, when, in fact, Odeon's business had traditionally been *slower* during that period.

11. The truth only began to be disclosed to the public on August 1, 2017, when, after the markets closed, AMC released its financial results for the quarter ending June 30, 2017 that were well below expectations. The press release stated that the Company expected revenues for the quarter of approximately $1.2 billion, and a net loss of between $178.5 million and $174.5 million—an approximate loss of $1.35 per diluted share. For fiscal 2017, AMC projected expected revenues of $5.1 billion to $5.23 billion, and a net loss of between $150 million to $125 million—an approximate loss of $1.17 to $0.97 per diluted share. As a result, AMC's stock price declined approximately 27%, losing $5.60 per share.

12. On August 4, 2017, AMC held a conference call with investors and analysts. During the call, Defendant Aron explained that the Company's second quarter was "simply a bust." He attributed the Company's dismal performance to a number of factors related to the Carmike acquisition and the European expansion.

13. With respect to the Carmike acquisition, the Company disclosed that the Carmike chain had experienced an 11.3% revenue decline during the quarter. Defendant Aron explained the Company's loss by disclosing that only 200,000 of Carmike's loyalty program members had joined AMC's loyalty program, requiring AMC "to start the loyalty program over from scratch."

14. Defendant Aron further explained that Carmike's poor performance was due to the fact that many of Carmike's theaters were badly in need of renovation, and had suffered from years of delayed modernization (for example, by adding reclining seats), and underinvestment, and disclosed that Carmike "didn't do very much" to modernize its circuit after it put itself under contract to be sold. "And so the circuit essentially went on dead stop around April-ish of '16." Based on whistleblower allegations in the later-filed Securities Class Action, Carmike had years

of delayed renovations, and had failed to upgrade wiring and projectors, in addition to not modernizing seating.

15. Defendant Aron also disclosed problems associated with the Company's European operations, explaining that AMC's "bust" quarter was attributed to the seasonality of the Company's international business. Defendant Aron asserted that "Q2, seasonally, is often the smallest quarter of the year in Europe." When questioned by a securities analyst as to why the seasonality of the Company's Q2 operations had not been previously disclosed, Defendant Aron explained that the non-disclosure was attributable to international accounting standards—an incongruous statement, given that seasonality is not dependent on the accounting standard utilized by the Company.

16. In the wake of the Company's disclosures regarding Carmike's performance and its European operations, the Securities Class Action was initiated against the Company's directors and officers,[2] pointing to, *inter alia*, misleading disclosures and omissions in the Company's SPO filings. The defendants in the Securities Class Action—including Defendants Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Locke, Koch, Jr., and Pawlus—moved to dismiss the entirety of the claims raised. On September 23, 2019, the Honorable Alison J. Nathan issued an Opinion and Order (the "Opinion") granting in part and denying in part the motion to dismiss. *Haw. Structural Ironworkers Pension Trust Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821 (S.D.N.Y. 2019).

17. Specifically, the Securities Class Action court found that plaintiffs had sufficiently alleged that: (1) "AMC omitted material information regarding Carmike's underinvestment in its theaters"; (2) "AMC omitted material information regarding the Carmike loyalty program"; and

[2] The Securities Class Action also named certain underwriters of the SPO as defendants.

(3) "AMC omitted material information regarding the seasonality of its European business."[3] *Haw. Structural*, 422 F. Supp. 3d at 836, 839, 841. Moreover, based in part on confidential witnesses, the court found a strong inference that Defendant Aron had acted with scienter with respect to his material misstatements and omissions regarding Carmike's underinvestment in its theaters—*i.e.*, that Defendant Aron "knew facts or had access to information suggesting that his public statements regarding Carmike's theaters were not accurate." *Id.* at 850. Accordingly, the court sustained plaintiffs' claims under Sections 11 and/or 15 of the Securities Act of 1933 (the "Securities Act") with respect to the misstatements and omissions detailed above against all defendants, and sustained plaintiffs' claims against under Sections 10(b) and/or 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder with respect to Carmike's underinvestment in its theaters against Defendant Aron. *Id.* at 859.

18. Following the damning findings in the Securities Class Action, Plaintiff sent a letter to AMC's Board of Directors (the "Board") on July 25, 2020 demanding that the Board take action to remedy the harm caused by the misconduct detailed herein (the "Litigation Demand").[4] Among other things, the Litigation Demand specifically demanded that the Board: (i) undertake a completely independent internal investigation into Defendants' violations of Delaware and/or federal law, (ii) take appropriate disciplinary action against the persons responsible for perpetrating the wrongdoing, (iii) commence a civil action against those individuals to recover damages incurred by the Company, and (iv) perform a comprehensive review of the Company's corporate governance and systems of internal controls to prevent a recurrence of the misconduct.

---

[3] Unless otherwise specified, for quotations herein all emphasis is added and all internal quotation marks and citations are omitted. Additionally, capitalization in quoted material may be altered.

[4] The Litigation Demand and its attendant exhibits are attached hereto as Exhibit 1.

19. More than a year has passed, however, and the Board has undertaken *none* of the items demanded in the Litigation Demand. Instead, by letter dated September 30, 2020 (the "Response"), Plaintiff was informed that the Board and a committee formed thereunder (the "Committee") had unanimously decided not to pursue the Litigation Demand "at this time" purportedly because "such action would risk adversely impacting the Company's defense of the Securities Class Action." Although the Response noted that it "***may*** be appropriate" to revisit the Litigation Demand after the Securities Class Action is resolved, to date the Board has not committed to doing so and continues to maintain its refusal of the Litigation Demand in violation of its obligations under Delaware law. Meanwhile, the Company continued to incur damages in the Securities Class Action, where the court recently granted plaintiffs' motion for class certification in full and ordered that the parties proceed with discovery. *Haw. Structural Ironworkers Pension Trust Fund, Inc. v. AMC Entm't Holdings, Inc.*, 338 F.R.D. 205, 210, 219 (S.D.N.Y. 2021).

20. Because the Board has constructively, wrongfully refused the Litigation Demand, Plaintiff now commences this derivative action in order to protect the Company, rectify the wrongs detailed herein, and hold the wrongdoers accountable for the damages they caused AMC.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This Court has exclusive jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78(aa) because Plaintiff's claims arise under Section 21D of the Exchange Act, 15 U.S.C. § 78u-4.

22. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §§ 1367(a).

23. This Court has jurisdiction over Defendants because each Defendant named herein

is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

24. Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because (i) one or more of the Defendants either resides in or maintains executive offices in this District, (ii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to AMC, occurred in this District, and/or (iii) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District. Further, AMC's common stock trades on the New York Stock Exchange, located within this District.

**THE PARTIES AND RELEVANT NON-PARTIES**

25. Plaintiff John R. Lyon III is a current AMC stockholder and has continuously been a stockholder since at least March of 2015.

26. Nominal Defendant AMC is a Delaware corporation maintaining its corporate headquarters in Leawood, Kansas. AMC is principally involved in the theatrical exhibition business and owns, operates or has interests in theaters located throughout the United States and Europe. AMC's common shares trade on the NYSE under the symbol "AMC." AMC is a defendant in the Securities Class Action, which alleges that it violated Sections 11, 12(a)(2) and 15 of the Securities Act.

27. Defendant Adam M. Aron has served as the Company's CEO and President and as a member of the Board since January 2016. In exchange for his purported trust, loyalty, and fidelity to the Company and its shareholders, Defendant Aron received total compensation in 2016

and 2017 of $10,932,004 and $7,447,156. Defendant Aron is a defendant in the Securities Class Action, which alleges that he violated Sections 11, 12(a)(2) and 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

28. Defendant Craig R. Ramsey served as the Company's CFO from June 2007 until he retired in February 2020. In exchange for his purported trust, loyalty, and fidelity to the Company and its shareholders, Defendant Ramsey received total compensation in 2016 and 2017 of $2,659,220 and $2,347,070, respectively. Defendant Ramsey is a defendant in the Securities Class Action, which alleges that he violated Sections 11, 12(a)(2) and 15 of the Securities Act.

29. Defendant Chris A. Cox has served as the Company's Senior Vice President and Chief Accounting Officer since June 2010. Defendant Cox is a defendant in the Securities Class Action, which alleges that he violated Sections 11, 12(a)(2) and 15 of the Securities Act.

30. Defendant Lincoln Zhang is AMC's non-executive Chairman and an AMC director. Defendant Zhang served as director and Chairman of AMC from August 2012 until his resignation on March 12, 2018. Defendant Zhang rejoined the Board beginning on December 2, 2019. Defendant Zhang is also an employee of Dalian Wanda Group Co., Ltd.[5]

31. Defendant Jack Q. Gao, served as a member of the Board from September 2015 until his resignation on October 27, 2017. In December 2016, Wanda agreed to make a capital contribution of $10,000,000 to AMC (without any increase in Wanda's economic interest or voting rights in the Company) for payment to certain officers, directors, and other personnel for

[5] In 2012, AMC was acquired by Dalian Wanda Group Corp., a private Chinese conglomerate. Although AMC went public in December 2013, Dalian Wanda Group Corp. retained a majority of AMC's shares and at all relevant times was AMC's controlling stockholder. Some of the Company's public filings, however, referred to AMC's controlling stockholder as Dalian Wanda Group Co., Ltd. This complaint refers to Dalian Wanda Group Corp. and Dalian Wanda Group Co., Ltd. interchangeably as "Wanda."

extraordinary services rendered in connection with merger and acquisition activity in 2016. This contribution was received during February 2017. As a result of these activities Defendant Gao received a bonus in the amount of $1,500,000 related to his service as a director. Defendant Gao is a defendant in the Securities Class Action, which alleges that he violated Sections 11, 12(a)(2) and 15 of the Securities Act.

32. Defendant Lloyd L. Hill served as a member of the Board since December 2013 and sits on the Audit Committee. In exchange for his purported trust, loyalty, and fidelity to the Company and its shareholders, Defendant Hill received total compensation in 2016 and 2017 of $168,704 and $226,455, respectively. Defendant Hill is a defendant in the Securities Class Action, which alleges that he violated Sections 11, 12(a)(2) and 15 of the Securities Act.

33. Defendant Gary F. Locke has served as a member of the Board since February 2016 and sits on the Nominating and Corporate Governance Committee. In exchange for his purported trust, loyalty, and fidelity to the Company and its shareholders, Defendant Locke received total compensation in 2016 and 2017 of $145,725 and $223,924, respectively. Defendant Locke is a defendant in the Securities Class Action, which alleges that he violated Sections 11, 12(a)(2) and 15 of the Securities Act.

34. Defendant Howard W. Koch, Jr. has served as a member of the Board since October 2014 and sits on the Nominating and Corporate Governance Committee. In exchange for his purported trust, loyalty, and fidelity to the Company and its shareholders, Defendant Koch received total compensation in 2016 and 2017 of $158,704 and $226,265, respectively. Defendant Koch is a defendant in the Securities Class Action, which alleges that he violated Sections 11, 12(a)(2) and 15 of the Securities Act.

35. Defendant Kathleen M. Pawlus has served as a member of the Board since

December 2014 and serves as Chair of the Audit Committee. In exchange for her purported trust, loyalty, and fidelity to the Company and its shareholders, Defendant Pawlus received total compensation in 2016 and 2017 of $163,704 and $236,265, respectively. Defendant Pawlus is a defendant in the Securities Class Action, which alleges that she violated Sections 11, 12(a)(2) and 15 of the Securities Act.

36. Defendant Anthony J. Saich has served as a member of the Board since August 2012 and serves as a member of the Audit Committee and Chair of the Nominating and Corporate Governance Committee. In exchange for his purported trust, loyalty, and fidelity to the Company and its shareholders, Defendant Saich received total compensation in 2016 and 2017 of $163,704 and $231,265, respectively. Defendant Saich is a defendant in the Securities Class Action, which alleges that he violated Sections 11, 12(a)(2) and 15 of the Securities Act.

37. Defendant Maojun Zeng has served as a member of the Board since February 2016 and as non-executive Chairman since March 14, 2018. Defendant Zeng is also an employee of Wanda. Defendant Zeng is a defendant in the Securities Class Action, which alleges that he violated Sections 11, 12(a)(2) and 15 of the Securities Act.

38. Defendant Philip Lader has served as a member of the Board since June 2019, and served as one of two members of the Committee. In exchange for his purported trust, loyalty, and fidelity to the Company and its shareholders, Defendant Lader received total compensation in 2020 of $251,237, including a $17,500 cash fee for his service on a special litigation committee established to investigate and evaluate certain derivative claims.

39. Defendant Lee E. Wittlinger has served as a member of the Board since September 2018, and served as one of two members of the Committee.

40. Defendant Adam J. Sussman has served as a member of the Board since May 2019.

In exchange for his purported trust, loyalty, and fidelity to the Company and its shareholders, Defendant Sussman received total compensation in 2020 of $221,237, including a $17,500 cash fee for his service on a special litigation committee established to investigate and evaluate certain derivative claims.

41. Nominal defendant AMC and Defendants Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Lock, Koch, Jr., and Pawlus are sometimes referred to herein as the "Securities Class Action Defendants."

42. Defendants Pawlus, Locke, Saich, Koch, Lader, Zeng, Aron, Sussman, Wittlinger, and Zhang are sometimes referred to herein as the "Demand Defendants."

43. Non-party Wanda is a multinational conglomerate based in Beijing, China. According to the Company's Schedule 14A filed with the SEC on March 17, 2017 (the "2017 Proxy Statement"), as of February 28, 2017, Wanda beneficially owned 75,826,927 shares of the Company's Class B common stock, representing approximately 80% of the total voting power as of that date.

## SUBSTANTIVE ALLEGATIONS

### A. Defendant Aron Takes the Helm at AMC and Embarks on an Overly-Aggressive Expansion Campaign

44. AMC operates in the theatrical exhibition business and, with locations throughout the United States and Europe, is the largest movie theater chain worldwide. AMC is a publicly traded company incorporated under Delaware law, with common stock traded on the NYSE under the ticker symbol "AMC." In August 2012, AMC was acquired by Wanda—a private multinational conglomerate based in China.[6] At all relevant times, the Company has relied on box

[6] According to the 2017 Proxy Statement, Wanda beneficially owned 75,826,927 shares of the Company's Class B common stock, representing approximately 80% of the total voting power

office admissions, food and beverage sales, on-screen advertising, customer loyalty program ("Stubs") fees, theater rentals, gift cards, and online ticket service fees for its revenues.

45. As part of an expansion project, in March 2016, AMC announced the acquisition Carmike. Unlike AMC's theaters, which have been substantially upgraded over the years, and are primarily located in wealthier metropolitan areas, Carmike primarily serviced smaller, more rural communities. The Carmike Acquisition was subject to an antitrust review of the Department of Justice (the "DOJ"), which was concluded on December 20, 2016—approximately nine months after the announcement. During this time AMC engaged in substantial pre-transaction due diligence with respect to the Carmike acquisition, and on December 20, 2016, during a conference call, AMC's President and CEO, Defendant Aron, informed investors that AMC had "plenty of time to look at … Carmike" and analyze Carmike's operations. The Carmike acquisition was completed on December 21, 2016, for $858.2 million, funded in part by a $350 million bridge loan. As part of the Carmike acquisition, AMC also assumed $230 million of Carmike's debt.

46. The Carmike acquisition was not AMC's first attempt to acquire Carmike. According to the confidential witness statements in the Securities Class Action, AMC initially considered acquiring Carmike in 2014, but, after AMC's then-existing leadership became aware of material issues with Carmike's infrastructure, acquisition efforts were abandoned.

47. In addition to the Carmike acquisition, in the second half of 2016 and the first half of 2017, AMC completed a full acquisition of two European theater chains: (1) Odeon, completed in November 2016 for total consideration of approximately $1.23 billion, and (2) Nordic, completed in March 2017 for $964 million in cash. Upon acquiring Odeon, AMC began reporting

---

as of February 28, 2017. Pursuant to AMC's September 14, 2018 dated press release, "Wanda now owns 50.01% of AMC through its 51,769,784 Class B Common shares" and "Wanda retains voting control of AMC."

its operations in two segments called "U.S. Market" and "International Markets." As part of the Odeon transaction, AMC paid $593.2 million of Odeon's outstanding debt. To fund its European acquisitions, AMC entered into additional debt commitments for a $675 million term loan and a $325 million bridge loan in January 2017, and issued $475 million and £250 million in notes in March 2017. By year's end, AMC owned, operated, or held interests in more than 1,000 theaters with more than 11,000 screens worldwide.

### B. <u>The Company's Massive Debt Obligations Force It to Conduct a Secondary Public Offering</u>

48. The Company incurred massive debt and other obligations in association with these large-scale acquisitions, reporting debt in the amount of $3.4 billion as of September 30, 2016. Just three months later, AMC's debt nearly doubled to $6.6 billion as of December 31, 2016, and proceeded to balloon in 2017 as AMC acquired Nordic.

49. While these acquisitions were significantly increasing AMC's outstanding debt, a *New York Times* article reported that the "debt burden facing companies [in China] … has been of increasing concern to the authorities and to analysts" and excessive loans to companies like Wanda "could put the broader economy at risk."[7] Further, the article noted that a "document that circulated on [July 17, 2017] appeared to show regulators telling the Agricultural Bank of China that it ***was forbidden to lend to six of Wanda's overseas acquisitions***, even if those ventures ran into difficulty raising money abroad. Two of the projects listed, deals to buy Carmike Cinemas and the Nordic Cinema Group, came under AMC Entertainment."[8] On July 18, 2017, AMC issued a press release announcing that "Wanda has never been a source of acquisition funding for AMC"

---

[7] Amie Tsang and Sui-Lee Wee, *AMC Tries to Steer Clear of Chinese Owner's Debt Worries* (July 19, 2017), https://cn.nytimes.com/business/20170719/amc-wanda-china-debt/en-us/. A copy of the article is attached hereto as Exhibit B to Exhibit 1.

[8] *See* Ex. 1 at Ex. B.

with respect to the Carmike, Nordic, and Odeon acquisitions, and "[m]ainland China-based banks have never been a source of any funding for AMC."

50. Thus, to deleverage the debt financing related to the Carmike acquisition and the European expansion, the Company undertook the SPO. On December 21, 2016, AMC filed the Registration Statement with the SEC.[9] In February 2017, the Company sold 20,330,874 common shares to the public in the SPO, realizing net proceeds of approximately $618 million.

### C. Defendants Make False and Misleading Statements Throughout the Relevant Period

#### 1. The Registration Statement

51. Throughout the relevant period, AMC made materially false and misleading statements to investors, and omitted material information concerning material adverse effects on AMC's financial performance. The Registration Statement omitted known information about the facts that (1) Carmike's theaters were in significant disrepair due to Carmike's underinvestment over a protracted period prior to the acquisition; (2) AMC had been unable to retain or convert members of Carmike's loyalty program members after the acquisition; and (3) AMC's newly acquired European theaters tended to underperform during the second quarter.

52. The Registration Statement incorporated Carmike's Form 10-Q for the third quarter of 2016 by reference, which contained false and misleading statements regarding Carmike's revenue growth over the first three quarters of the year. Particularly, this Form 10-Q announced that Carmike's "[t]otal operating revenues increased 16.4% to $209.7 million for the three months ended September 30, 2016" and "[t]otal operating revenues increased 6.3% to $620.6 million for the nine months ended September 30, 2016." In relying upon the misrepresentations in Carmike's

---

[9] The Registration Statement was signed by Defendants Aron, Ramsey, Cox, Zhang, Zeng, Saich, Hill, Locke, Koch, Pawlus, and Gao.

10-Q, the Registration Statement failed to disclose material changes in Carmike's operations and results, including the state of disrepair of Carmike's theaters due to Carmike's protracted underinvestment.

**2. The December 20, 2016 Conference Call**

53. On a December 20, 2016 conference call with analysts and investors concerning the acquisition of Carmike, Defendant Aron stated that AMC "***had plenty of time to look at the Carmike circuit***," and "spen[t] eight months with the Justice Department of the United States" related to due diligence and regulatory review of the Carmike acquisition. Defendant Aron also stated that during AMC's due diligence process, AMC determined that "there are plenty of Carmike theaters that are substantial enough in their visitation or locales to graduate, so to speak, into the AMC brand," and that, ***"[w]e have identified that there are an easy 50 to 100 Carmike theaters that are capable of supporting an AMC-style renovation***" involving, *e.g.*, upgrading those theaters to AMC-style recliner seating. With respect to Odeon, Defendant Aron stated that AMC's "teams ***have already been on the ground since day one in Europe*** working with our colleagues at Odeon to integrate the UK and Europe's largest movie exhibition circuit into the growing world of AMC."

54. Defendant Aron also emphasized that the Carmike Acquisition will "***broaden our appeal at*** moviegoers with more people having access to the ***AMC Stubs loyalty program*** redesigned in July" and even after extensive due-diligence, they are still "***as confident today as we were back in March [2016]*** when this transaction was first announced, that the growth potential for AMC is enhanced by joining forces with Carmike Cinemas."

**3. The January 23, 2017 Conference Call**

55. On January 23, 2017, AMC announced that it had entered into a definitive agreement to acquire Nordic and held a conference call with analysts and investors to discuss the

pending acquisition. During the call, Defendant Aron took the opportunity to boast about the "flawless" execution of AMC's integration of Carmike and Odeon. Defendant Aron also reiterated his confidence that such acquisitions would continue to benefit the Company and stated:

> So far, vis-a-vis Carmike and Odeon, our efforts as best we can tell, surrounding integration planning and integration execution have been ***flawless***.... Allocating our capital so dramatically to growth through acquisition, in both our theater count and countries served ***obviously confirms that AMC is confident and optimistic about the future of being in the movie theater business. We further believe that confidence is well-placed***.

56. Defendant Aron further proclaimed that the Company's revenues and EBITDA would grow as a result of its acquisitions, including Carmike and its loyalty program, as well as its investment in renovating Carmike theaters.

> ***I think AMC has grown smartly this year, through M&A activity***. It's not the only way we've grown, but I like our new website, and ***I like our new AMC Stubs loyalty program***, and I like our new pricing department, and ***they're going to help us grow revenues and grow EBITDA***, too. But, and we are obviously investing in renovating theaters in the US and putting in recliner seating to another third of our circuit over the next two years, so ***there's plenty that's going to cause growth***.

57. As to AMC's acquisition of Nordic, Defendant Aron announced that the transaction would close in time for AMC to experience financial benefit from a "***busy summer film slate***." However, this statement was false and misleading because Aron never disclosed that the slow summer seasons in the legacy Odeon and Nordic circuits would offset any purported benefits from the acquisitions.

**4. Press Release for 2016 Year-End Financial Results and Conference Call**

58. On February 28, 2017, AMC announced its 2016 fourth quarter and year-end financial results, highlighting record-setting quarterly and year-end financials across its revenue categories, including admissions, food and beverage, and "other." This announcement also stated that proceeds from the SPO would be used to pay for AMC's recent acquisitions. During an investor/analyst conference call on the same day, Defendant Aron touted these results in glowing

terms and stated:

> AMC set new ***all-time high records*** for every revenue segment and adjusted EBITDA, exceeding $3 billion in total revenues for the first time ever, growing nearly 10% to a record $3.2 billion. ***That $3.2 billion record we set in 2016 is one that we will literally shatter in 2017, with revenues that are likely to well exceed $5 billion***.

59. Defendant Aron further touted the importance of the Company's Stubs loyalty program and the dramatic results of recent efforts to redesign the program and stated:

> During the latter half of 2016, we revolutionized our already successful loyalty program, redesigning and relaunching AMC Stubs. AMC Stubs had been locked in with about 2.5 million member households but without meaningful growth in some three years. By contrast, ***membership in the redesigned AMC Stubs has simply exploded***.
>
> AMC Stubs membership has just recently crossed over the six-million member household mark. Some 5.5 million of these households have purchased an AMC ticket in the past 12 months and all have had some interaction with us in the past 24 months. ***With sign-up rates of a stunning 400,000 to 500,000 new member households continuing right now each month, we hope that we can reach 10 million member households in the AMC Stubs program and the AMC customer database sometime in 2017***.

60. Defendant Aron also disclosed that 2017 would be a "transition" year for Carmike, with AMC having to incur "start-up and transition costs," and that benefits from "recliner renovations" would not be visible until very late in 2017 and 2018:

> 2017 will be a transition year for Odeon and Carmike Theaters. There are startup and transition costs; additionally, since the recliner renovations deployments take on average six to 12 months to complete and although we have already begun, the lift in these investments won't be visible until very late in 2017 and well into 2018. Having said all that, these are absolutely the right investments to make and ***we are very confident in their earnings power***.
>
> The Carmike acquisition combined, as you know, the number two and number four circuits in the US to create the largest exhibition circuit in the US.... Carmike offers AMC complementary markets in suburban and rural regions of the country, with little market overlap, and gives AMC a truly national footprint. ***We will deploy some of our strategic growth initiatives at every Carmike Theater and many will be renovated full-blown with recliner seating***.

> ***We have also identified $35 million of cost synergies, which we believe will be substantially realized by the end of 2017. We've already begun the integration in earnest, converting point-of-sale systems and vendor contracts and commencing initiative deployments***.

61. In the Q&A session of the conference call, Defendant Aron continued to make materially false and misleading statements about renovations at AMC's theaters. Indeed, when asked about the "relative performance of theaters that have not been reseated or given enhanced food and beverage" and "the potential level of drag those theaters are having on the overall average," the significant problems experienced at legacy Carmike theaters did not figure at all into Defendant Aron's response. Instead, Defendant Aron described both renovated and non-renovated theaters as experiencing mind-blowing revenue growth by stating "***when you renovate theaters, okay, you get a big pop***" and "***our renovated theaters, as a class, are doing extremely well, with significant double-digit revenue growth that would blow your mind if we shared that number with you***," while "the non-renovated theaters are growing at single-digit growth."

**5. The March 10, 2017 Form 10-K**

62. On March 10, 2017, AMC filed its 2016 Form 10-K reporting its financial results for the fourth quarter and year end results with the SEC, which was signed by Defendants Aron, Ramsey, Cox, Gao, Zhang, Zeng, Saich, Hill, Locke, Koch, and Pawlus (the "2016 Form 10-K"). The 2016 Form 10-K contained materially false and misleading disclosures and omissions regarding operations of Carmike, seasonality in the International Markets segment, problems with the customer loyalty program, management's discussion and analysis ("MD&A"), financial statements, internal control over financial reporting ("ICFR"), and disclosure control certifications signed by Defendants Aron and Ramsey. AMC's 2016 Form 10-K disclosed the following regarding Carmike:

> Legacy Carmike theaters are located primarily in smaller, suburban and rural markets, which affects total revenues per theater. ***However, in general, theaters***

> ***located in smaller suburban and rural markets tend to have less competition and a lower cost structure, and we believe when combined with our innovative strategic initiatives that productivity will improve***.
>
> * * *
>
> In December 2016, we completed the acquisition of Carmike for cash and stock. The purchase price for Carmike was $858.2 million comprised of cash of $584.3 million and 8,189,808 shares of our Class A common stock with a fair value of $273.9 million (based on a closing share price of $33.45 per share on December 20, 2016). We also assumed $230.0 million aggregate principal amount of 6.00% Senior Secured Notes due June 15, 2023 (the "Senior Secured Notes due 2023"), in connection with the acquisition of Carmike. As of December 21, 2016, Carmike operated 271 theaters with 2,923 screens in small and mid-sized markets in 41 states, which further complements our U.S. markets segment. ***We expect to realize approximately $35.0 million of synergies and cost savings related to this acquisition as a result of purchasing and procurement economies of scale and general and administrative expense savings, particularly with respect to the consolidation of corporate related functions and elimination of redundancies***.

63. As to the seasonality of AMC's business, the 2016 Form 10-K highlighted the seasonality of its domestic market theaters, but ignored the unfavorable seasonal patterns of its recently acquired international market theaters.

> Our revenues are dependent upon the timing of motion picture releases by distributors. The most marketable motion pictures are usually released during the summer and the year-end holiday seasons. Therefore, ***our business is highly seasonal, with higher attendance and revenues generally occurring during the summer months and holiday seasons***. Our results of operations may vary significantly from quarter to quarter.

64. Moreover, AMC's history of international operations experience reveals that the Company was well aware of seasonal sales patterns in European markets and its duty to disclose such patterns in relation to its newly acquired European businesses. Before J.P. Morgan Chase and Apollo Management took the Company private in 2004, AMC operated in thirteen different countries, including the United Kingdom, Spain, and Portugal—the same countries in which it acquired the Odeon and Nordic theaters. In fact, at the Citi Global Internet, Media and Telecommunications Conference on January 5, 2017, Defendant Ramsey represented:

> ***[W]e do have experience, let me say it that way, operating in international markets***. And if you went back to a time before we were owned by private equity, if you went back into the late 1990s, you would find that ***we had theater operations in 13 different countries around the world***. We then became private equity-owned and sold those assets off. ***We are an experienced international operator***.
>
> * * *
>
> The strategic direction will come from AMC. ***Direction, again, that bears the background and knowledge of all the years that we've successfully operated internationally***. We think the European markets are ripe for remodels and renovations. There have actually been about four remodels in the UK where they did the recliner reseating. Another exhibitor did that. ***And we watched – studied the box office trends and saw similar improvements in revenues post renovation similar to what we've experienced here in the U.S.*** So we're quite confident that the recliner remodel strategy will work well.

65. The Company had also drawn on its international operations experience in the Registration Statement, touting that AMC's "senior management team has experience operating both domestic and international theatres, having at one time operated more than 100 theatres with more than 1,200 screens in 11 countries outside of the United States."

66. As Defendant Ramsey would later tell attendees at a B. Riley & Co. Investor Conference on May 4, 2017, the Company's current personnel included previous managers of overseas operations:

> And then, look at overseas. ***We have participated in overseas markets before. One point in time, our company was in 13 different foreign countries. It's not new to us***. We got people that shower every morning and come to work, and they've had experience running companies in the territories where we're currently operating. So didn't scare us.

67. The 2016 Form 10-K also misrepresented the status and growth of AMC's Stubs customer loyalty program. In relevant part, the 2016 Form 10-K reported:

> New members are enrolling in the new AMC Stubs program at a rate greater than 11 times the number of enrollments during the same period in 2015. Our AMC Stubs members represented approximately 23% of AMC U.S. markets attendance during the year ended December 31, 2016. ***We expect the number of member households to continue to increase over the next 24 to 36 months***. We believe

> movie-goers want to be recognized and rewarded for attending our theaters and as a result, our new AMC Stubs program is designed to strengthen guest loyalty, attract new guests and drive additional return visits. Our much larger database of identified moviegoers also provides us with additional insight into our customers' movie preferences, and this enables us to have both a larger and a more targeted marketing effort to support our Hollywood studio partners. ***We intend to creatively mine this rapidly growing consumer database to increase sales and otherwise boost loyalty to AMC***.

68. AMC's renovation plans for Carmike theaters were also misrepresented in the 2016 Form 10-K, reporting in relevant part:

> As of December 31, 2016, we now feature recliner seating in approximately 190 theatres, including Dine-in Theatres, totaling approximately 1,984 screens and representing approximately 35% of total legacy AMC screens. By the end of 2017 and 2018, we expect legacy AMC theatres to operate 2,650 and 3,350 screens with recliner seating, respectively. Based on feedback from our guests, we believe there is universal appeal for the ample space, comfort and convenience of our powered recliners, and that appeal will translate into additional attendance in new markets both domestically and in Europe. ***As such, deploying powered recliners will be an integral strategy in the former Carmike and Odeon circuits going forward as we are targeting approximately 42% of our total screens to be comprised of screens with recliner seating by the end of 2021***.

**6. The May 8, 2017 Form 10-Q and Conference Call**

69. On May 8, 2017, AMC filed its Form 10-Q with the SEC, announcing its financial results for the first quarter period ended March 31, 2017, which was signed by Defendants Aron and Ramsey. The Form 10-Q contained the same material misrepresentations and omissions as did the 2016 Form 10-K, as detailed above. Specifically, the Form 10-Q contained materially false and misleading statements and omissions regarding (1) Carmike's pre-acquisition protracted underinvestment in its theaters; (2) AMC's inability to retain or convert members of Carmike's loyalty program to the AMC Stubs program; (3) the seasonality of AMC's international businesses; (4) false and misleading statements and omissions in AMC's financial statements and MD&A sections; and (5) false and misleading statements and omissions regarding ICFR effectiveness and Aron's and Ramsey's certifications.

70. In a press release announcing the Form 10-Q, Defendant Aron again painted a rosy financial picture, stating, in relevant part:

> ***AMC is off to a tremendous and record start in 2017***. AMC's ability to purposefully act on the opportunities and innovations that drive growth continues to set us apart and further solidifies our leadership position among movie-theater operators in the U.S. and Europe.... Achieving record first quarter 2017 Adjusted EBITDA of $251.3 million is tangible evidence of what we have been saying for the better part of a year, that ***the earnings power of this new incarnation of a larger and more influential AMC is enormous compared to other operators and even to our own recent past***….
>
> We would particularly point out three important developments at AMC so far this year. First, at the legacy pre-acquisition AMC theaters, we grew revenues at a meaningfully faster pace than the industry at large, due in part to our commitment to renovating theaters and the strength of our impactful marketing programs. Second, ***with our domestic acquisition, our rapid move to achieve cost synergies and efficiencies brought immediate bottom line benefit, offsetting revenue weakness that had been prevalent at Carmike for eight of the twelve months and three of the last four months of 2016***. We are directly focused on improving revenues at the acquired domestic theaters, as well as furthering the cost reduction efforts that already are well in hand. And third, we are thrilled both by our brisk start in driving immediate revenue and earnings growth in constant currency in Europe, and the likelihood that our plans to drive even more earnings through renovation of European theaters will come to initial fruition in quantity as early as the end of 2018….
>
> ***We are only just beginning to unlock the growth potential of our recent acquisitions. The initial integration efforts of creating a transformed AMC have been done quickly and have been very smooth***. As we now move to make what we expect will be highly lucrative investments in guest-facing initiatives like powered recliner seats, enhanced food and beverage offerings and the expansion of premium large format experiences, ***we are as confident as we could be in the future earnings potential of AMC. We remain optimistic about the opportunity to continue to deliver meaningful value to our shareholders both in the balance of 2017 and in the years ahead***.

71. On the same date, AMC held a conference call with analysts and investors to discuss AMC's 2017 first quarter financial results. During the call, Defendant Aron highlighted AMC's "outstanding" results for first quarter that "exceed[ed] all consensus estimates for both revenue and EDITDA." Defendant Aron also reiterated his glowing comments on AMC's recent

acquisitions by stating:

> AMC's first quarter was marked most noticeably by our growth to more than 1,000 theaters and more than 11,000 screens, thanks to the closing of our Carmike and Odeon acquisitions late in Q4 '16, and the signing and ahead-of-schedule closing of our Nordic Cinema Group acquisition, wholly within Q1 '17. ***Our integration of these added theaters has gone incredibly smoothly and we have moved fast to capture expense synergies that were promised as these acquisitions were announced***.
>
> As for theater enhancement, we quickened the deployment pace for our strategic initiatives, ***with more theaters now equipped with recliner seating than anyone else in our industry***, and their attendant investment return metrics still being quite lucrative and well ahead of the 25% cash-on-cash unlevered returns of our investment hurdles....
>
> ***Our marketing activity continues to amaze even us. Literally all of the Carmike Theaters will cut over to the AMC brands, programs, websites and systems by the end of this week, with the Carmike name retired. And speaking of the efficacy of those marketing programs, AMC Stubs … participation continues to soar***. As of today, we have 7,553,209 AMC Stubs member households. We previously announced hitting 5 million member households on December 19 of last year; announced 6 million member households on February 13 of this year; and 7 million member households on April 13, less than a month ago. ***So in a year, we've tripled the Stubs membership to numbers that we believe are light-years ahead of any other exhibitor program and the numbers continue to grow rapidly***.

72. During the call, Defendant Aron also made the following statements regarding theater renovations, stating, in relevant part:

> ***Our recliner renovation investments are still comfortably exceeding our 25% unlevered cash on cash return hurdles, while handily outperforming the first quarter U.S. industry box office revenue per screen by 830 basis points and also outpacing U.S. industry attendance per screen by 270 basis points***.
>
> In having more recliner screens than any other U.S. circuit, recliners as a percentage of AMC's U.S. theater count are now 32%, virtually all of them in the legacy AMC circuit and very few in the Carmike circuit. ***As long as the financial returns stay as solid as they are now, we expect to renovate an additional 118 theaters in the United States***, representing 1,480 U.S. screens in 2017 and 2018, which would bring us to 326 recliner-equipped theaters in the U.S. That's about 51% of our entire domestic footprint, including all of the theaters of the newly-acquired Carmike circuit, which were off to a very slow start under prior ownership. ***So the opportunity with all these recliner-equipped theaters to deliver outsized performance of returns in the immediate term ahead is clear. Continued***

> ***investment in our strategic initiatives across both our legacy and acquired theaters will continue to create value for AMC and for our shareholders***.

73. Also during the call, Defendant Aron made glowing representations of AMC's loyalty program and marketing efforts. In relevant part, he stated:

> ***We could not be more excited about our AMC Stubs loyalty program*** and the redesigned website and mobile apps that span the divide between the physical theater setting and the digital experiences our consumers prefer.
>
> As previously mentioned, ***our rapidly growing number of AMC Stubs members accounted for approximately 25% of all ticket sales in Q1, and will soon account for more than 30% of all AMC moviegoers in the United States***. These tens of millions of purchase histories now captured in our database offer us a ***treasure trove of data*** and consumer information for us to use to market AMC and future movie going more effectively.

74. As to integration of Carmike theaters, Defendant Aron assured investors that the process was "running very smoothly" and "[t]here have literally been no operational snafus of any note to report." While addressing Carmike's poor 2016 revenues, Defendant Aron assured investors that AMC "expect[ed] [it] to reverse soon" and divulged that this poor performance made Carmike an attractive target for acquisition. Defendant Aron also downplayed Carmike's revenue softness and walked back his previous characterization of the issue.

> With respect to the Carmike theaters, when I talk about revenue softness, I'm not talking about revenue declines. ***What I'm talking about is that the AMC Theaters have been growing faster than the Carmike theaters have been growing, if you take, though, the totality of it all***. So no, we're – there's no thought to shuttering any Carmike theaters.
>
> ***
>
> ***[W]e're highly confident we're going to make a lot of progress across the Carmike system.***

75. Defendant Aron continued to minimize ongoing and impending problems with Carmike. Defendant Aron stated that "[t]here are a ***lot of Carmike theaters that are doing just great***. So we've gotten ***quite granular looking theater by theater by theater***, and there are so

many reasons" for poor performance such as "Carmike theaters did have competitive activity around them. And they – since Carmike was not a company ***that really believed in recliner seats***, they didn't counter some of that competitive activity by putting in re-seated theaters of their own."

76. Defendant Aron further downplayed Carmike's problems by boasting of AMC's aggressive and cost-effective rebranding and promising "more upside to come," without any mention of Carmike's pre-acquisition protracted underinvestment that caused stagnation of its theaters. In relevant part, he stated:

> When we have a theater that we renovate, we do it in 3 to 6 months. ***Two of the largest theaters in their system, they shut down for renovation, and I believe they're going to be closed for 15 months – which, again, I know it's only 2 theaters out of 270***, but when they're significant theaters of size and when you're starting to look at all these things on 0.10% here and 1% over there, it matters.
>
> ***
>
> The Carmike theaters in question have only been branded as AMC theaters in the last 30, 60, 90 days. The first cut-over was mid-January, and the last cut-over is going to be mid-May. ***So as these theaters become AMC-branded theaters with more potent marketing programs and the like and some targeted investment to improve the product, we think we'll see real benefits***.
>
> So we're not at all upset about all this. It's just more upside to come. And I said it before, but I'll say it again, thank goodness we moved fast to get cost synergies because that's one of the things that allowed us to have a blowout quarter, even with these Carmike issues to deal with.

**D. <u>The Statements Were False and Misleading</u>**

77. The public statements detailed herein were false and misleading. The Individual Defendants knew, but failed to disclose, that operations at Carmike were suffering from Carmike's pre-acquisition protracted underinvestment and AMC's inability to retain or convert loyalty program members, and that these facts would have a material adverse effect on AMC's capital resources and operating results. Additionally, the Individual Defendants knew, but failed to disclose, that the Company's international business segment would experience lower attendance

and revenues during the summer months.

78. AMC's Board-level documents and the confidential witness statements detailed in the Securities Class Action demonstrate that Defendants were provided with sufficient information to have been well aware that (1) Carmike's theaters had been in a state of disrepair at the time of acquisition; (2) converting Carmike's loyalty program members to AMC's Stubs program would be crucial to the Company's operations/results; and (3) AMC's newly acquired Nordic and Odeon theaters in Europe tended to experience a pattern of lowered second-quarter sales. Despite having been provided information on the true status of AMC's, Carmike's, and Nordic's operations, the Individual Defendants made and/or failed to correct these materially false and misleading public statements made to investors through numerous conference calls and SEC filings.

**1. Misleading Statements Concerning Carmike Integration**

79. The Company's public statements regarding the Carmike theaters' smooth, synergistic integration of Carmike and the benefits of acquiring Carmike's operations were false and misleading and issues with the legacy Carmike theaters were significantly downplayed. Because in reality (1) prior to the acquisition, Carmike had allowed its theaters to fall into disrepair, and (2) reversing the effects of Carmike's underinvestment would require significant time and investment from AMC.

80. In fact, AMC Board-level documents demonstrate that the Board was aware of the dismal state of Carmike's facilities and that Carmike's financial forecast for the 2016 fiscal year was below "the Street" estimates. At a February 25, 2016 AMC Board meeting, Aron updated the Board as to the proposed Carmike acquisition, codenamed "Project Carl."[10] During the Board

---

[10] This meeting was attended by Defendants Aron, Locke, Saich, Pawlus, Hill, Koch Gao, and a Wanda representative.

meeting, Citigroup consultant Derek Van Zandt ("Van Zandt") made a presentation regarding ongoing due diligence of Carmike and its theaters.

81. On March 3, 2016, during a special telephonic meeting of the Board, Defendant Aron informed the Board that "the industrial logic for the Carmike acquisition had not changed nor had management's enthusiasm for the transaction."[11] Van Zandt provided an update of Citi's fairness opinion at a price of $29.85 per share, providing a "strategic rationale for the transaction" as well as a "Carmike valuation analysis." The Board voted to approve the acquisition of Carmike for $29.85 per share and gave Defendant Aron discretion to increase the price to $30.50 per share if needed. The Board also discussed the merger agreement between AMC and Carmike. The merger agreement required that Carmike continue operations in the ordinary course of business through the closing of the transaction, stating in relevant part in Section 4.10:

> Since the [Carmike] Balance Sheet Date until the date hereof, there has not been any Circumstance that has had, or would reasonably be expected to have, individually or in the aggregate, a [Carmike] Material Adverse Effect. ***Since the [Carmike] Balance Sheet Date (a) the business of [Carmike] and its Subsidiaries has been conducted in the ordinary course consistent with past practices in all material respects*** and (b) there has not been any action taken by [Carmike] or any of its Subsidiaries that, if taken during the period from the date of this Agreement through the Effective Time without Parent's consent, would constitute a breach of Sections 6.01(a),6.01(b).6.01(c)or 6.01(d).

82. Early discussions of renovation plans for Carmike theaters further indicate that Defendants were aware of the true state of the theaters AMC was preparing to acquire. During a regular Board meeting on April 26-27, 2016, AMC's then-CFO Defendant Ramsey presented Carmike's first-quarter financial results, and the Board spent roughly one hour discussing the Company's plan to "remodel/reseat approximately 50 Carmike theaters and to renovate an

[11] This meeting was attended by Defendants Aron, Locke, Saich, Pawlus, Hill, Koch and Gao.

additional 75 theaters in small markets."[12] During this meeting, Defendant Aron informed attendees that the Company was facing "challenges" associated with the Carmike merger while operational transitions were proceeding.

83. Moreover, Defendants not only knew that Carmike's theaters were in a state of disrepair, but also knew that many of those theaters were weak performers. Materials from the April 27, 2016 meeting also included a chart introduced by the heading, "Carmike Fleet has 210 'Non-Initiative/Non-Value' Units," and depicting the distribution of such units by trade area size and attendance per seat.

84. On July 24, 2016, Defendant Aron again discussed the Carmike acquisition at a special meeting and informed attendees that he had increased AMC's per-share offer to $33.06, because the transaction would fail at the previous $30 offer. Concerning both the Carmike and Odeon acquisitions, Defendant Hill "inquired about the Company's ability to do both transactions at the same time and continue its internal capex deployment plans."[13]

85. At a regular Board meeting two days later, Defendant Aron presented an "M&A Update" in which he "explained that locking down the Carmike transaction would continue to be a tricky process."[14] Regarding the Company's "multi-year capital plan," Defendant Aron reported to the Board that revised proposed capex plans had been "designed to address the capex needs associated with the Odeon and Carmike acquisitions," and Defendant Ramsey presented a slide "layering in the Carmike acquisition which would require an additional $287M of capex over five

---

12 This meeting was attended by Defendants Gao, Locke, Saich, Hill, Koch, Pawlus, Aron, Zhang, Zeng, and a Wanda representative.

13 This meeting was attended by Defendants Ramsey, Aron, Saich, Pawlus, Hill, Koch, and a Wanda representative.

14 This meeting was attended by Defendants Ramsey, Gao, Locke, Saich, Hill, Koch, Pawlus, Aron, Zhang, Zeng, and a Wanda representative.

years."

86. On August 2 and 3, 2017, during a regular Board meeting, Defendant Ramsey reviewed Nordic, Odeon, Carmike, and legacy AMC financial results, noting, "the sluggish Q2 domestic box office had offset [legacy AMC's] good financial results for Q1."[15] A presentation updating the Board on AMC's Carmike integration efforts included a discussion "as to Carmike's relative underperformance and the reasons for the poor results."

87. On October 26 and 27, 2017, during a regular Board meeting, Defendant Aron presented on "important learnings about Carmike," informing the Board that "Carmike's non-reclined theaters fell 12% year-to-date, similar to legacy AMC theaters that weren't reclined."[16] In his presentation of third quarter financial results, Defendant Ramsey informed the Board that the "legacy Carmike circuit was down 25.9%," compared to a decline of 11.3% for legacy AMC.

88. Confidential witnesses interviewed in connection with the Securities Class Action also confirmed that Defendants knew of Carmike's significant infrastructure issues. For instance, CW-1, employed by AMC as a systems administrator from June 2011 to December 2017, confirmed that AMC originally considered acquiring Carmike in 2014, but "pulled the plug" after its due diligence revealed unexpected issues and weaknesses. CW-1 stated that AMC's executive leadership first examined the potential acquisition of Carmike in 2014, and CW-1 had been among a group of AMC employees scheduled to visit Carmike's headquarters to review its information technology ("IT") infrastructure. However, according to CW-1, this review never occurred, as AMC's management came to the conclusion that Carmike would be a "lemon."

---

15 This meeting was attended by Defendants Ramsey, Gao, Locke, Saich, Hill, Koch, Pawlus, Aron, and a Wanda representative.

16 This meeting was attended by Defendants Ramsey, Locke, Saich, Hill, Koch, Pawlus, Zeng, Aron, and a Wanda representative.

89. Furthermore, CW-1 corroborated that Carmike suffered from a protracted period of underinvestment, precisely as AMC was later forced to admit in August 2017. According to CW-1, Carmike had been outsourcing its IT infrastructure needs to save money, thereby requiring "major renovations" to its IT infrastructure. CW-1 also noted that the Carmike theaters needed updates to their equipment and hardware, such as wiring and projectors and stated that AMC constantly "struggled" to determine how to support and network Carmike's outdated equipment with that of AMC's theaters.

90. CW-2, employed by Carmike from October 2005 to December 2016 as one of 12 district managers, corroborated CW-1's statements. According to CW-2, whose duties involved overseeing about 10% of Carmike theaters located in 12 states in the western United States, approximately 70% of the theaters CW-2 managed were in "disrepair," and the same was likely true of the remaining Carmike districts. CW-2 stated that theaters suffering losses were denied repairs – some of those repairs critical. For example, CW-2 said that it took years to obtain corporate approval for repairs to a broken HVAC system in one theater. CW-2 noted further that Carmike "consciously neglected" its theaters and that, as a result, the cost to update the circuit would be "huge."

91. CW-2 also revealed that Carmike's period of protracted underinvestment in its theaters did not begin when the acquisition was announced, as Defendant Aron later admitted in August 2017. Rather, Carmike pursued an extremely slow pace of renovating its theaters for at least three to four years before the announcement and continued at the same pace. Moreover, CW-2 confirmed that Carmike meticulously tracked operational and financial performance, preparing and reviewing monthly profit and loss reports for each of its theaters, and a significant number of theaters had been losing money for several years. CW-2's account, taken together with Carmike's

statement in its October 11, 2016 Schedule 14A that AMC had called off its prior bid to acquire Carmike because AMC's "management and board [at the time, Defendants Zhang, Saich, Hill, Koch, and Pawlus] grew increasingly less comfortable with the terms of the transaction," indicates that even Defendant Aron's August 2017 admission was false, because AMC was well aware that Carmike had been extremely slow to renovate/repair its theaters and had been losing money for years prior to the acquisition.

92. In addition, CW-2 confirmed that AMC conducted, and Carmike assisted with, extensive due diligence prior to the acquisition. According to CW-2, corporate personnel in Carmike's headquarters provided AMC full access to data about Carmike's operations and financials throughout AMC's due diligence process. CW-2 reportedly learned, from conversations with personnel in Carmike's headquarters, that AMC representatives began working out of Carmike's headquarters daily, as early as April 2016. CW-2 also stated that (1) none of Carmike's data were withheld from or off-limits to AMC; (2) as early as summer 2016, Carmike executives directed management to provide AMC access to "whatever they wanted," including real-time operations and financial data, and (3) AMC had direct access to these and all other data for months thereafter.

93. CW-2 further stated that it was common knowledge among employees and executives at Carmike that the theater chain had been underperforming and experiencing significant revenue weaknesses during AMC's due diligence process. In fact, CW-2 could recall that Carmike's former CEO, David Passman, in some way acknowledged that Carmike would have gone bankrupt within six months if not for AMC's acquisition deal. As Defendant Aron acknowledged during AMC's December 20, 2016 investor conference call, the Company's due diligence process, which included cooperating with the DOJ's antitrust examination, provided the

Defendants with detailed knowledge about the true state of Carmike's operations prior to the acquisition.

94. Moreover, on September 23, 2019, the Securities Class Action court denied the defendants' motion to dismiss in part, finding that the plaintiffs sufficiently alleged omissions regarding Carmike's underinvestment/theater disrepair, loyalty program enrollment, and European business seasonality, as well as numerous misleading statements about the true condition of Carmike's theaters and difficulties associated with integrating them into AMC's business. *Haw. Structural*, 422 F. Supp. 3d 821. Particularly, the court's Opinion emphasized that CW-1 and CW-2 statements "as to Carmike's underinvestment … lend ***further support to an inference of scienter***." *Id.* at 851. In relevant part, the Opinion held that:

> Plaintiffs also sufficiently allege that CW-1 and CW-2 were aware of "what information was communicated to senior executives." CW-2 alleges that AMC had effectively unfettered access to Carmike's data for months during the due diligence process. While this on its own might not support an inference of knowledge, ***it does so in light of Aron's statements about the level of due diligence performed, specifically the evaluation of dozens of theaters for renovations.*** Similarly, CW-1 alleges that ***AMC's executive leadership was already aware of issues with Carmike's infrastructure as far back as 2014***, when AMC had previously considered acquiring Carmike. It is a reasonable inference that this information would have been passed on or at least been made available to AMC's executives when they decided to acquire Carmike in 2016 and considered during the due diligence process. ***Finally, CW-2 and CW-1's testimony about the extent of underinvestment offers some further support to this inference that this information would have been passed along to senior executives***. The allegations regarding CW-1 and CW-2 thus provide some further support for an inference of scienter as to Carmike's underinvestment.

*Id.* at 851-52.

95. With respect to the credibility of the above-referenced statements of confidential witnesses, the Opinion found that it was described "in the complaint with sufficient particularity to support to the probability that a person in the position occupied by the source would possess the information alleged." *Haw. Structural*, 422 F. Supp. 3d at 851. Specifically, "CW-1 was a systems

administrator at AMC up through December 2017, which makes it probable that they would know about Carmike's information technology infrastructure." *Id.* Further, the Opinion held that CW-2 was "one of twelve Carmike district managers, which makes it probable that they would have information about the state of Carmike's theaters." *Id.*

96. Additionally, the Opinion found that the Securities Class Action Defendants had a duty to update, and that AMC had "an affirmative duty to disclose information relating to Carmike's underinvestment" and "was required to disclose this information, at the very least, subsequently to the formal completion of the acquisition of Carmike, which occurred prior to the SPO." *Haw. Structural*, 422 F. Supp. 3d at 838. The Opinion further found that statements concerning plans to renovate Carmike theaters were misleading by omission because it was "plausibly alleged that an ***investor could have reasonably inferred from these statements that there were no substantial, systemic obstacles to renovations***." *Id.* at 844.

97. Accordingly, the Securities Class Action court found that Defendant Aron's "conduct was highly unreasonable and represented an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Haw. Structural*, 422 F. Supp. 3d at 853. The Opinion also held that certain the Securities Class Action Defendants could be liable under Sections 11 and 15 of the Securities Act as control persons of the Company because "all of the Individual Defendants either signed the registration statement personally or through an attorney-in-fact." *Id.* at 858. Similarly, the Securities Class Action court found Defendants Aron and Ramsey liable as a control persons under Section 20(a) of the Exchange Act, holding that, "Aron and Ramsey signed the Registration Statement and other SEC filings ... this is sufficient to allege that they are control persons with the meaning of Section 20(a)." *Id.*

**2. Misleading Statements Concerning AMC Loyalty Program**

98. The statements referenced herein were also false and misleading with respect to participation growth of the AMC Stubs loyalty program, because AMC failed to disclose its inability to retain or convert Carmike's loyalty program members after the acquisition, which was adversely affecting AMC's operating performance.

99. According to the Securities Class Action confidential witness, CW-4—a former AMC employee who worked as Senior Director of Enterprise Applications and Operations from April 2017 to March 2018, AMC had intended to convert all prior members of Carmike's loyalty program to the AMC Stubs program. However, finding automatic enrollment/migration too expensive, AMC instead relied on Carmike loyalty program members to sign up for AMC Stubs on their own.

100. The Securities Class Action court denied the defendants' motion to dismiss "for failure to plausibly allege that AMC materially omitted information about difficulties integrating Carmike's loyalty program." *Haw. Structural*, 422 F. Supp. 3d 841. The Opinion held that AMC's "failure to convert or retain Carmike loyalty program members was plausibly knowable prior to the SPO." *Id.* at 840. Further, the Opinion held that AMC's general warnings that "moviegoers in those markets or customer[s] may not accept AMC's strategies writ large are not sufficient" because "prior to the SPO AMC was already having significant problems retaining or converting Carmike loyalty program members" and therefore the Securities Class Action Defendants "did not sufficiently warn of this risk." *Id.* at 841.

**3. Misleading Statements Regarding Seasonality of AMC's International Business**

101. The statements referenced herein were also false and misleading with respect to the seasonality of each of AMC's business segments, because they failed to disclose the expectation

that the Company's international business segment would experience lower attendance and revenues during the summer months.

102. On June 24, 2016, the Board discussed both the Carmike and Odeon acquisitions during a special telephonic meeting.[17] An Odeon due diligence presentation by Defendant Ramsey and Van Zandt included both prior actual financial results and future financial forecasts, each spanning several years.

103. On July 11, 2016, during another special telephonic Board meeting, Defendant Aron updated the Board regarding Odeon due diligence and informed it that Carmike stockholders would "most likely reject the deal if AMC did not increase its $30 per share cash offer."[18] The meeting minutes indicate that "[u]pon inquiry from the Board, a discussion followed concerning cash flow projections assuming both the Odeon/UCI and Carmike transactions were consummated." After reviewing the material terms of the transaction documents for the Odeon acquisition, the Board approved resolutions authorizing the transaction.

104. On January 17, 2017, during a special Board meeting, Defendant Aron presented the Board with an overview of the proposed Nordic acquisition, and the Board approved resolutions for acquiring Nordic and financing the transaction following Defendant Aron's summary of Nordic's business and financial due diligence findings.[19] Similarly, on February 14, 2017, during a regular Board meeting, attendees were informed of the "challenging" nature of

---

[17] This meeting was attended by Defendants Aron, Locke, Saich, Pawlus, Hill, Koch, Gao, and a Wanda representative.

[18] This meeting was attended by Defendants Aron, Locke, Saich, Pawlus, Hill, Koch, Gao, and a representative from Wanda.

[19] This meeting was attended by Defendants Ramsey, Aron, Zhang, Gao, Locke, Pawlus, Hill, Koch, and a Wanda representative.

integrating Nordic's operations involving six different countries and cultures.[20]

105. According to the Securities Class Action confidential witness, CW-3—a Senior Project Manager contracted to work on the Company's Odeon integration project from September 2016 to January 2017, certain of the Defendants knew that AMC's newly-acquired international operations, in contrast to AMC's domestic operations, typically underperformed during the summer season. Specifically, CW-3 was part of a team, led by AMC Director of Accounting Systems Ryan Gound, responsible for receiving, mapping, and integrating Odeon's financial reporting data into AMC's Hyperion Financial Management system ("Hyperion"), a software system for financial planning and budgeting. According to CW-3, AMC received raw financial data from Odeon and successfully mapped and integrated that data into the Company's Hyperion system between September and December 2016. CW-3 confirmed that the information received from Odeon and integrated into the Company's Hyperion system was granular enough to inform certain Securities Class Action Defendants as to monthly and seasonal financial performance trends in Odeon's business.

106. Accordingly, the Securities Class Action court held that 17 C.F.R. §229.101(c)(1)(v) "required disclosure of the seasonality of AMC's international business." *Haw. Structural*, 422 F. Supp. 3d at 842. Specifically, the Opinion explained that although "AMC's business is only 23% international," jurisprudence "has indicated that a numerical threshold of five percent of a business's assets is a good starting place for assessing the materiality of the alleged misstatement." *Id.*

---

20 This meeting was attended by Defendants Ramsey, Zhang, Gao, Locke, Saich, Hill, Koch, Pawlus, Aron, and a Wanda representative.

## E. Defendants' Fraud Unravels and the Truth Begins to Emerge

107. After the market closed on August 1, 2017, AMC issued an announcement of its preliminary second quarter financial results for the period ending June 30, 2017. AMC announced that it expected to report quarterly revenue of approximately $1.2 billion and a net loss between $178.5 and $174.5 million. The announcement also stated that AMC expected its 2017 revenues to be between $5.1 billion and $5.23 billion and its 2017 net loss to be between $150 million and $125 million.

108. In response to these dismal results, the price of AMC common stock price plunged nearly 27% on heavy trading volume, from $20.80 per share on August 1, 2017 to $15.20 per share on August 2, 2017—a 57% fall from its most recent high of $35.45.

109. During an August 4, 2017 conference call with analysts and investors to discuss the Company's preliminary second quarter results, Defendant Aron commented that the quarter was "simply a bust," highlighting several reasons for the Company's poor results, including, as he admitted for the first time, that "Q2, seasonally, is often the smallest quarter of the year in Europe." When a securities analyst asked if there was "a reason why [they] weren't able to disclose [the seasonality of AMC's international business]," Defendant Aron stated falsely that AMC did not disclose the information because international operations were accounted for under international accounting standards. After the Company released its 2017 second quarter preliminary earnings results, discussions of the seasonality of AMC's international business included one analyst's observation that the lack of disclosure "played a role in our (and likely the Street's) mismodeling of the quarter."

110. Defendant Aron also admitted that Carmike's performance was a major contributor to AMC's poor 2017 second quarter results, stating: "[o]ur legacy AMC theaters were stars,

outperforming the industry, but our acquired Carmike theaters … were not stars." He explained that in the second quarter of 2017, box office results across the United States were down 4.4% while, in contrast, admissions revenues at legacy AMC theaters—largely renovated with new reclining seats—were down only 3.1%. However, the newly-acquired Carmike theaters suffered an extreme ***11.3% revenue decline*** during the second quarter—nearly triple the national average. In addition, Defendant Aron informed investors that the "substantial savings" AMC had realized during the quarter, were, in fact, "all absorbed by and offset by higher operating costs."

111. During the Q&A session, Defendant Aron explained that Carmike's poor 2017 second quarter performance resulted from "literally six" different issues that had been having a material adverse effect on Carmike's operations and patron attendance, which AMC estimated would take until at least 2018 to resolve. According to Defendant Aron, these issues included AMC's inability to retain or convert Carmike's loyalty program members after the acquisition. Defendant Aron further stated that Carmike's poor performance was due to the fact that many of Carmike's theaters were badly in need of renovation, and had suffered from years of delayed modernization (for example, by adding reclining seats), and underinvestment, and disclosed that Carmike "***didn't do very much***" to modernize its circuit after it put itself under contract to be sold. "***And so the circuit essentially went on dead stop around April-ish of '16***."

112. Although these revelations were shocking to the investing public, none of this information was new to Defendants. Indeed, AMC's Board-level documents confirm that they were well aware of the state of Carmike's theaters prior to the Carmike acquisition and had already planned/budgeted for renovations. Particularly, documents detailing the maintenance requirements and quality of the Carmike facilities as well as AMC's renovation plans for certain Carmike theaters was known or should have known by the Defendants, and Defendants Hill, Koch,

Locke, Pawlus, Saich, Zeng, and Zhang possessed actual knowledge regarding these issues.

113. With respect to AMC's inability to retain or convert Carmike's loyalty program members, Defendant Aron admitted:

> When Carmike was handed over to us on December 21, only 200,000 individuals from their loyalty program joined our loyalty program. Even though, at the same time, AMC has over 9 million people from our loyalty program coming – stemming out of the – by then, it would have been about 7 million in the loyalty program. ***So we've had to start the loyalty program essentially over from scratch***.

114. As a result of the materially false and misleading statements and omissions detailed herein, AMC common stock traded at artificially inflated prices throughout the relevant time period. During the SPO, AMC sold 20,330,874 common shares realizing net proceeds of approximately $618 million. As AMC's controlling shareholder, Wanda realized the SPO's benefits. By making or otherwise permitting these statements, Defendants materially misled the investing public, thereby inflating AMC's stock price. These statements and omissions as alleged herein were materially false and misleading in that they failed to disclose material, adverse information and misrepresented the truth about the Company and its business.

### F. The Securities Class Action Survives a Motion to Dismiss Under Heightened Pleading Standards and Obtains Class Certification

115. In the wake of the Company's disclosures regarding Carmike's performance and its European operations, the Securities Class Action was initiated against the Company's directors and officers, pointing to, *inter alia*, misleading disclosures and omissions in the Company's SPO filings. The defendants in the Securities Class Action—including Defendants Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Locke, Koch, Jr., and Pawlus—moved to dismiss the entirety of the claims raised. On September 23, 2019, the Honorable Alison J. Nathan issued the Opinion granting in part and denying in part the motion to dismiss. *Haw. Structural*, 422 F. Supp. 3d 821 (S.D.N.Y. 2019).

116. Specifically, the Securities Class Action court found that plaintiffs had sufficiently alleged that: (1) "AMC omitted material information regarding Carmike's underinvestment in its theaters"; (2) "AMC omitted material information regarding the Carmike loyalty program"; and (3) "AMC omitted material information regarding the seasonality of its European business." *Haw. Structural*, 422 F. Supp. 3d at 836, 839, 841. Moreover, based in part on confidential witnesses, the court found a strong inference that Defendant Aron had acted with scienter with respect to his material misstatements and omissions regarding Carmike's underinvestment in its theaters—*i.e.*, that Defendant Aron "knew facts or had access to information suggesting that his public statements regarding Carmike's theaters were not accurate." *Id.* at 850. Accordingly, the court sustained plaintiffs' claims under Sections 11 and/or 15 of the Securities Act with respect to the misstatements and omissions detailed above against all defendants, and sustained plaintiffs' claims against under Sections 10(b) and/or 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder with respect to Carmike's underinvestment in its theaters against Defendant Aron. *Id.* at 859.

117. Thereafter, on March 30, 2021, the Securities Class Action court certified the Securities Class Action as a class action and granted plaintiff's proposed class certification in full while denying AMC's proposed exclusions from the class definition. Particularly, the Class Certification Order certified the Securities Class Action as a class action on behalf of a class consisting of:

> [P]ersons and entities similarly situated who purchased or otherwise acquired: (i) the common stock of AMC Entertainment Holdings, Inc. … pursuant or traceable to its secondary public offering … on or about February 8, 2017; and (ii) all persons and entities who purchased or acquired the publicly traded common stock of AMC between December 20, 2016 and August 1, 2017, inclusive.

*Haw. Structural*, 338 F.R.D. at 210.

118. Accordingly, the Securities Class Action court ordered that "[t]he parties are to proceed with discovery." *Id.* at 219.

**G. The Board Constructively, Wrongfully Refuses Plaintiff's Litigation Demand**

119. On July 15, 2020, pursuant to Delaware law, Plaintiff, through his counsel, Melinda A. Nicholson, made the Litigation Demand on the Board to, *inter alia*, conduct "a completely independent internal investigation into," and pursue through litigation, the claims asserted in this action, "take appropriate disciplinary action … of the persons responsible for perpetration of the wrongdoing," and "undertake a comprehensive review and overhaul of the Company's corporate governance and compliance practices and systems of internal controls and reporting." Plaintiff also demanded that the Company immediately enter into a tolling agreement with each of the Individual Defendants and Wanda, in order to allow the Board sufficient time to accomplish these tasks.

120. On July 30, 2020, counsel for the Company, John A. Neuwirth of Weil, Gotshal & Manges LLP, responded that the Litigation Demand had been provided to the Board, and that Plaintiff would be "informed with respect to the Board's decision concerning the [Litigation] Demand once a decision is made." Mr. Neurwirth notably did not respond to Plaintiff's request for tolling agreements, nor did he confirm that the Board had undertaken an independent investigation into the Litigation Demand. A copy of Mr. Neuwirth's July 30, 2020 letter is attached hereto as Exhibit 2.

121. Accordingly, on September 10, 2020, Ms. Nicholson responded to the July 30 letter, asking that counsel promptly confirm that the Company had commenced an independent internal investigation into the matters set forth in the Litigation Demand and that it had received executed tolling agreements from the Individual Defendants and Wanda. A copy of Ms. Nicholson's

September 10, 2020 letter is attached hereto as Exhibit 3.

122. On September 22, 2020, Mr. Neuwirth responded to the September 10 letter, advising that the Board had referred the Litigation Demand to a purportedly "independent committee" of the Board to consider the facts and circumstances surrounding the Litigation Demand and make a recommendation to the Board with respect to whether or not the actions demanded (or any other action with respect to the subject matter of the Litigation Demand) would be in the best interest of AMC and its stockholders. Mr. Neuwirth further advised that the Committee had engaged the law firm of Ross Aronstam & Moritz LLP ("RAM") to provide purportedly "independent counsel" in connection with the Committee's consideration of the Litigation Demand. Mr. Neuwirth concluded by stating that Plaintiff would be "informed with respect to the Board's decision concerning the [Litigation] Demand once a decision is made. But again, Mr. Neuwirth did not mention whether the Company had obtained any tolling agreements. A copy of Mr. Neuwirth's September 22, 2020 letter is attached hereto as Exhibit 4.

123. On September 30, 2020, Bradley R. Aronstam of RAM responded to the Litigation Demand, advising that "the Board has determined not to pursue the [Litigation] Demand at this time." According to the Response, "in February 2020, the Board established a committee consisting of Philip Lader and Lee E. Wittlinger" to consider a stockholder demand purportedly focusing on the same wrongdoing as alleged in the Litigation Demand (the "Shute Demand"). The Committee determined that "it would not be in the best interests of the Company or its stockholders" to commence the litigation demanded in the Shute Demand at that time because "such action would risk adversely impacting the Company's defense of the Securities Action." The Response further advised that the Litigation Demand had been referred to the same Committee, and that the Committee had "determined that pursuing the [Litigation] Demand at this

time would not be in the best interests of the Company or its stockholders for substantially the same reasons that the Board decided not to pursue the Shute Demand." However, the Response also stated that the Committee "recognized it may be appropriate to revisit the demanded litigation after the Securities Action is resolved." A copy of Mr. Aronstam's September 30, 2020 Response is attached hereto as Exhibit 5.

124. On October 12, 2020, Ms. Nicholson responded to the September 30 letter, noting that it was unclear from the response whether the Committee and the Board had merely deferred making a decision regarding the Litigation Demand until after resolution of the Securities Class Action, or whether they had outright rejected the Litigation Demand, and requesting that Mr. Aronstam clarify which was the case. [redacted] Finally, given the Committee's reticence to perform an independent investigation, Ms. Nicholson provided corporate governance reforms which were carefully tailored and specifically designed to prevent a recurrence of the misconduct alleged in the Litigation Demand that had damaged AMC and its stockholders. A copy of Ms. Nicholson's October 12, 2020 letter is attached hereto as Exhibit 6.

125. On November 10, 2020, Mr. Aronstam responded to the October 12 letter, clarifying that while the Board had deferred pursuing the Litigation Demand, the Board had "not ruled out the possibility of revisiting the demanded litigation in the future, but has deferred that decision (and the possibility of a costly and robust inquiry into the underlying merits of the central securities allegations in the [Litigation] Demand) until after final resolution of the [Securities Class Action]." [redacted]

[redacted] Finally, Mr. Aronstam advised that the Board would not implement any of the proposed corporate governance reforms, because the Board had not conducted an investigation concluded that misconduct had occurred. A copy of Mr. Aronstam's November 10, 2020 letter is attached hereto as Exhibit 7.

126. [redacted].

127. On April 1, 2021, Ms. Nicholson sent a letter to Mr. Aronstam advising that, while the Board is deferring its consideration of the Litigation Demand, a notable negative ruling was issued against AMC by the Securities Class Action court. On March 30, 2021, the Securities Class Action court certified the Securities Class Action as a class action and granted plaintiff's proposed class certification in full while denying AMC's proposed exclusions from the class definition. Particularly, the Class Certification Order certified the Securities Class Action as a class action on behalf of a class consisting of:

> All persons and entities who purchased or otherwise acquired: (i) the common stock of AMC Entertainment Holdings, Inc. ("AMC" or the "Company") pursuant to its secondary public offering ("SPO") on or about February 8, 2017; and (ii) all persons and entities who purchased or acquired the publicly-traded common stock of AMC between December 20, 2016 to August 1, 2017, inclusive ("Class Period"), excluding Defendants, members of the immediate family of any Defendant, any subsidiaries and/or affiliates of any Defendant, and person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors,-in-interest or assigns of any such excluded party.

Ms. Nicholson's letter concluded by noting that this decision provides further support for the wrongdoing alleged in the Litigation Demand, as well as solidifies the Company's exposure to damages in the Securities Class Action, making it imperative that the Committee conduct an appropriate and fulsome review of the Litigation Demand. A copy of Ms. Nicholson's April 1,

2021 letter is attached hereto as Exhibit 8.

128. On September 8, 2021, Ms. Nicholson sent a letter to Mr. Aronstam (with a copy to the Company's counsel, Mr. Neuwirth) noting that Plaintiff had become aware that the plaintiffs in the Securities Class Action and the Company had reached an agreement to resolve the matter on September 2, 2021. Accordingly, Ms. Nicholson's letter demanded an "***immediate*** update on the status of the Committee and the Board's consideration of the Litigation Demand and all subsequent communications." (emphasis in original). Indeed, Ms. Nicholson's letter noted that, by the terms of Mr. Aronstam's own letter of November 10, 2020, the Litigation Demand was now ripe for consideration. Ms. Nicholson's letter concluded by advising that, "[i]f we do not receive a satisfactory and prompt response—particularly in light of the fact that the Company has ignored and delayed a review of the Litigation Demand for over a year and failed to respond to our appropriate supplemental correspondence—we will take all appropriate actions." A copy of Ms. Nicholson's September 8, 2021 letter is attached hereto as Exhibit 9.

129. To date, neither the Board, the Committee, the Committee's counsel, nor the Company's counsel has sent any further correspondence indicating that the Board or Committee will undertake an investigation into the Litigation Demand. The Board's and Committee's refusal to do so constitutes a wrongful constructive refusal of the Litigation Demand. Indeed, there is no basis to continue to defer consideration of the Litigation Demand while the Company continued to incur damages in the Securities Class Action. And indeed, the Securities Class Action court has already found the claims therein to be well-founded under heightened pleading standards and approved class certification. The Board's and Committee's delay can only serve to harm the Company. The only possible conclusion is that the Board and Committee acted in bad faith and in breach of their fiduciary duties in failing to investigate and consider the Litigation Demand,

while in fact intending to reject the Litigation Demand from the outset.

130. Because the Board and Committee have wrongfully refused the Litigation Demand, Plaintiff now commences this derivative action in order to protect the Company, rectify the wrongs detailed herein, and hold the wrongdoers accountable for the damages they caused AMC.

**SPECIFIC FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

131. The Individual Defendants had stringent fiduciary obligations to AMC and its stockholders.

132. By reason of their positions as officers and/or directors of AMC and as AMC's controlling stockholder, the Individual Defendants owed and owe the Company and its stockholders fiduciary obligations of loyalty, good faith, due care, disclosure, candor, and oversight, and were and are required to use their utmost ability to control and manage AMC in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of AMC and its stockholders so as to benefit all stockholders equally and not in furtherance of their own personal interests or benefits.

133. In addition, as officers and/or directors of a publicly held company and as the company's controlling stockholder, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial condition.

134. The Individual Defendants, because of their positions of control and authority as directors and/or officers of AMC and as its controlling stockholder, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with AMC, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper

representations of AMC.

135. Further, each of the Individual Defendants was and is bound by AMC's Code of Business Conduct and Ethics (the "Code"), which states, in pertinent part:

> This Code of Business Conduct and Ethics is applicable to all of our directors, officers, including designated officers, and other associates (as such terms are defined below) of AMC Entertainment Holdings, Inc. and provides a general statement of our expectations regarding ethical standards to which such persons are expected to adhere. The Company's more detailed policies and procedures set forth in its various work conduct policies are separate requirements, including the Compliance Plan, Conflicts of Interest Policy, Disclosure Policy and Related Person Transaction Policy.

136. The Code underscores that AMC "strive to comply with all laws and governmental regulations applicable to" the Company, and, with respect to the "Public Communications," AMC is "committed to providing full, fair and accurate disclosure in all public communications and in compliance with all applicable law, regulations and rules."

137. Pursuant to the Code, the Individual Defendants must follow the accounting control standards for "Internal Financial Controls and Reports," which states, in pertinent part:

> Accounting control standards and procedures exist to ensure that our assets are protected and properly used and our financial reports and records are accurate and reliable. The accuracy of these reports depends upon the accuracy of the information provided. All documents supporting the financial records should be accurate and should reflect the true nature of the transaction. You should not falsify or otherwise provide information that is not accurate or complete in connection with any Company form or record.

138. Additionally, the Code provides clear guidance with respect to "Accurate and Timely Periodic Reports," and states that:

> [W]e expect our designated officers and others responsible for such matters to conduct themselves in such a way that we will:
>
> - comply with generally accepted accounting principles at all times;
> - maintain a system of internal accounting controls that will provide reasonable assurances to management that all transactions are properly recorded;

- maintain books and records that accurately and fairly reflect our transactions;

***

- maintain a system of disclosure controls and procedures that will provide reasonable assurances to management that material information about us is made known to management, particularly during the periods in which our periodic reports are being prepared; and
- present information in our periodic reports and other public communications in a full, fair, accurate, timely, clear and understandable manner.

139. The Board and Committee also had and have a duty to conduct a good faith, reasonable, and objective investigation into the allegations in the Litigation Demand.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

140. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

141. During all times relevant thereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to mislead the investing public, including stockholders of AMC, regarding the Company's financial health and growth prospects. In furtherance of this plan, the Individual Defendants, collectively and individually, took the actions set forth herein.

142. The purpose and effect of the Individual Defendants' course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and unjust enrichment, and to conceal adverse information concerning the Company's operations, financial condition, and investment risk profile.

143. Each of the Individual Defendants aided and abetted and rendered substantial

assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of the wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DERIVATIVE AND DEMAND ALLEGATIONS

144. Plaintiff brings this action derivatively for the benefit of AMC to redress injuries suffered, and to be suffered, by the Company as a direct result of breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.

145. AMC is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

146. Plaintiff will adequately and fairly represent the interests of AMC in enforcing and prosecuting its rights.

147. Plaintiff is a stockholder of AMC and has continuously owned stock in the Company since at least March of 2015.

148. On July 15, 2020, Plaintiff made the Litigation Demand on the Board to independently investigate the foregoing facts and claims arising from them, and to commence litigation against the corporate fiduciaries and others responsible for damaging AMC.

149. Upon receiving the Litigation Demand, the Board had an affirmative duty under Delaware law to conduct a good faith, reasonable, and objective investigation into the allegations in the Litigation Demand and to reach a good faith, reasonable, and objective conclusion regarding the potential claims detailed in the Litigation Demand.

150. However, to date, the Board and Committee have refused to undertake any of the actions detailed in the Litigation Demand in indefinite deference to the Securities Class Action,

which has already found such allegations plausible under heightened pleading standards, and just recently, approved class certification. Meanwhile, the Company continued to incur damage as a result, and evidence that could potentially support its derivative claims wastes away by the day.

151. The only possible conclusion is that the Board and Committee acted in bad faith and in breach of their fiduciary duties in refusing to investigate and consider the Litigation Demand, and in fact have intended to reject the Litigation Demand from the outset.

152. Because the Board and Committee have constructively and wrongfully refused the Litigation Demand, Plaintiff now commences this derivative action in order to protect the Company, rectify the wrongs detailed herein, and hold the wrongdoers accountable for the damages they caused AMC.

153. Prosecution of this action, independent of the current Board, is in the best interest of the Company.

154. The wrongful acts complained of herein subject, and will continue to subject, AMC to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

**COUNT I**
**BREACH OF FIDUCIARY DUTY**
**(Against the Individual Defendants)**

155. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth therein.

156. Each of the Individual Defendants owed and owe AMC fiduciary duties. By reason of their fiduciary relationships, the Individual Defendants owed and owe AMC the highest obligations of good faith, fair dealing, loyalty, and due care.

157. In addition, as part of their duty to exercise good faith and diligence in the administration of the affairs of the Company, the Individual Defendants had and have a duty to

promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections, and forecasts, as well as other material facts bearing upon its operations and financial condition.

158. Each of the Individual Defendants violated and breached these fiduciary duties by making and/or allowing false and misleading statements to the public. For example, Defendants Aron, Ramsey, Cox, Zhang, Zeng, Saich, Hill, Locke, Koch, Pawlus, and Gao signed the Registration Statement, which contained numerous false and misleading statements regarding Carmike's underinvestment in its theaters, the Carmike loyalty program, and the seasonality of AMC's European business. Defendants Aron, Ramsey, Cox, Gao, Zhang, Zeng, Saich, Hill, Locke, Koch, and Pawlus further signed the 2016 Form 10-K, which contained materially false and misleading disclosures and omissions regarding these same issues and also included false and misleading ICFR and disclosure control certifications.

159. The Demand Defendants further breached their fiduciary duties by constructively, wrongfully refusing Plaintiff's Litigation Demand in bad faith.

160. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, AMC has sustained substantial damages, including direct monetary damages and damages to its reputation and goodwill in the capital markets. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

161. Plaintiffs, on behalf of AMC, have no adequate remedy at law.

**COUNT II**
**WASTE OF CORPORATE ASSETS**
**(Against the Individual Defendants)**

162. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth therein.

163. As a result of the Individual Defendants' conduct, by failing to properly consider the interests of the Company and its public stockholders and by failing to conduct proper supervision, the Individual Defendants have caused AMC to waste valuable corporate assets by paying compensation and/or bonuses to certain of its executive officers and incur potentially billions of dollars of legal liability and/or legal costs to defend the Individual Defendants' actions.

164. Because of the waste of corporate assets, the Individual Defendants are liable to the Company.

165. Plaintiff, on behalf of AMC, has no adequate remedy at law.

**COUNT III**
**UNJUST ENRICHMENT/CONSTRUCTIVE TRUST**
**(Against the Individual Defendants)**

166. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth therein.

167. The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to AMC, and/or have aided and abetted such unjust enrichment.

168. The Individual Defendants should be required to account for and disgorge all realized monies, profits, commissions, bonuses, and gains (including directors' fees and related compensation for attending meetings and rendering other services) which they have obtained and will unjustly obtain at the expense of AMC, and a constructive trust should be imposed thereon for the benefit of the Company.

169. Plaintiff, as a stockholder and representative of AMC, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary

breaches.

170. Plaintiff, on behalf of AMC, has no adequate remedy at law.

**COUNT IV**
**CONTRIBUTION AND INDEMNIFICATION UNDER THE EXCHANGE ACT**
**(Against Defendants Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Lock, Koch, Jr., and Pawlus)**

171. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth therein.

172. Defendants Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Lock, Koch, Jr., and Pawlus are named as defendants in the related Securities Class Action. The conduct of these defendants, as described herein, has exposed the Company to significant liability under various federal securities laws by their disloyal acts.

173. AMC is named as a defendant in the Securities Class Action that alleges and asserts claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If AMC is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of Defendants Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Lock, Koch, Jr., and Pawlus as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from Defendants Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Lock, Koch, Jr., and Pawlus in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

174. As officers, directors and otherwise, Defendants Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Lock, Koch, Jr., and Pawlus had the power or ability to, and did, control or influence, either directly or indirectly, AMC's general affairs, including the content of its public

statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act, Rule 10b-5 promulgated thereunder, and other securities laws.

175. Defendants Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Lock, Koch, Jr., and Pawlus are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

176. Defendants Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Lock, Koch, Jr., and Pawlus have damaged the Company and are liable to the Company for contribution.

177. Plaintiff, on behalf of AMC, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of AMC, demand judgment as follows:

A. declaring that each of the Individual Defendants breached his, her, or its fiduciary and other duties owed to AMC and its stockholders as alleged herein;

B. directing the Individual Defendants, jointly and severally, to account for all loses and damages sustained by AMC caused by reason of the acts and omissions complained of herein;

C. awarding AMC money damages against all Individual Defendants for all losses and damages sustained and to be sustained by the Company and its stockholders as a result of the acts and omissions complained of herein;

D. directing the Individual Defendants to account for and to remit and disgorge to AMC all profits and other benefits and unjust enrichment they have obtained and retained as a result of the acts and omissions complained of herein, including all salaries, bonuses, fees, stock awards, options, compensation, and AMC common stock sale proceeds

together with the earnings upon such amounts by which such Defendants were unjustly enriched and imposing a constructive trust thereon as well as the earnings such Defendants have received thereupon;

E. ordering the Company to take all necessary actions to reform and improve its corporate governance, risk management, compliance, and internal control procedures for the purpose not only of preventing a recurrence of the failures detailed above, but to optimize such procedures in light of relevant and current best practices;

F. awarding AMC pre-judgment and post-judgment interest as allowed by law;

G. awarding AMC punitive damages;

H. awarding Plaintiff's attorneys' fees, expert fees, consultant fees, and other costs and expenses; and

I. granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: September 23, 2021

**Public Version Dated: September 24, 2021**

Respectfully submitted,

**KAHN SWICK & FOTI, LLC**

*/s/ Melinda A. Nicholson*

MELINDA A. NICHOLSON (MN-6251)
NICOLAS KRAVITZ
ALAYNE GOBEILLE
1100 Poydras Street – Suite 3200
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: Melinda.Nicholson@ksfcounsel.com
Email: Nicolas.Kravitz@ksfcounsel.com
Email: Alayne.Gobeille@ksfcounsel.com

-and-

J. RYAN LOPATKA
**KAHN SWICK & FOTI, LLC**
250 Park Ave., Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: j.lopatka@ksfcounsel.com

*Counsel for Plaintiff John R. Lyon III*